John Vietor on behalf of Appellant, the Dow Chemical Company. We are here under breach contract case. The jury awarded damages to Dow's contractor under a service agreement to provide non-destructive testing services to Dow. And the reason we're here is because this is a service agreement which is to perform work on an as-needed basis. It is undisputed that the contract itself under Section 1.1 states that Dow will utilize the services as needed. This is a master service agreement. It's not a requirements contract. It is undisputed in all of the depositions, all the trial testimony, that there is no, absolutely no requirement by Dow to utilize the services of Gulf at any point during the term of the agreement. It's also undisputed that Gulf cannot perform services under the contract unless it complies with 6.1 of the agreement, which requires that the work be authorized in writing before the work is performed. It is also undisputed that the integration clause of the contract, 27.1, states that the contract cannot be revised unless it's agreed to in writing by both parties. And it's undisputed that we terminated this contract under Section 3.1A, which is the without-cause provision that states any party may terminate the contract without cause, for any reason, at any time, or for no reason, with 90 days' advance written notice. And it's also undisputed that we did this in good faith, as that issue was decided by the district court and did not go to the jury. And so the reason why we are here on a $130,000 case is because this is a scenario where Dow is ordered to pay damages to a contractor for work it never authorized, for work that was never performed, and we simply cannot allow it to stand because of the hundreds of independent contractor contracts that are currently working on our facilities throughout Louisiana, employing thousands of employees. But even greater ramifications is this rewrites Louisiana law by allowing the jury— What is the purpose of the 90-day notice? The purpose of the 90-day notice is for cause. And so the 90-day notice is to make sure, one, that Dow has a contractor available at all times during that 90 days, because if Dow loses its contractor, then Dow doesn't have the ability to perform destructive testing on its facilities. We have another, but we need two for a reason. And secondly, it's to protect the contractor. If we have authorized work in writing, the without clause allows them to complete that work. And that's the difference between the other provisions. The other provisions, 3.1b and c and 3.2, those are for cause provisions. Either you're terminated immediately because you violate the contract, you file bankruptcy or fraud, or you have five days to cure the defect. And under those, you don't have the right to complete authorized work unless you satisfy the contract, unless you cure the defect or unless you prove it wasn't fraud or prove it wasn't bankruptcy. So that's the for clause provision. And that is what Your Honor is getting to. At the end of the day, we're contesting, we're asking the court to reverse and render with regards to the denial of the summary judgment and the Rule 50 motions. Counsel, let me ask you about work in progress and what is the state of the record on that. There is testimony, as I understand it, that is disputed that Gulf says they were ordered to leave, Ms. Calm or whatever her name is, denied that that happened. So we at least have something in this record that says Gulf was not able to complete whatever its projects were. If that's true, do we have any evidence in the record about what they were doing, what Gulf was doing at the time of this 90-day notice being given, what projects they may have had? What's the evidence? And so I'll answer that in two ways, Your Honor. First, the evidence that was offered about trying to attack Mr. Mackey's credibility was offered solely for that purpose and was inadmissible hearsay. With regards to Ms. Coon's testimony, she said that she believed there was work that they had yet to complete. The testimony and the facts that lay out at trial is, number one, all work was assigned in writing in a package. So the informal communications were memorialized in writing and they had a Monday through Thursday work week. So Thursday they assigned the work to be done for Monday. And so it's a formal written project. They give it to them on Monday. Monday, September 14th, is when they receive the written notice of termination. Tuesday, September 15th, Gulf, the testimony is clear and explicit through the CEO and their on-site supervisor, Mr. Mackey, that Gulf terminated every single one of its employees on Tuesday, a day after receiving the written notice of termination. Well, but how does that fit in with the argument of testimony? You tell me what it's based on, that they were told they had to leave. And so we have that in this record. Your Honor, our position is there is no valid evidence in the record that they were actually told. What is the evidence? Assume – what is the evidence? So this is with regards to the impermissible impeachment that we briefed. Mr. Mackey is Gulf's on-site supervisor. Mr. Mackey is the one who was on-site. Mr. Massimini was not. So Mr. Mackey was never asked directly, did Dow tell you you had to leave? Instead, he was asked the question, did anyone at Dow shorten the 90-day contract term? And when Mr. Massimini came on the stand, his testimony regarding what Mr. Mackey was told by someone else was allowed as impeachment to Mr. Mackey without Mr. Mackey ever being asked a direct question. But put that aside. Even if you assume – and I'll say this – even if you assume that someone at Dow told Gulf what they say is in the record, which is you have to be gone by Friday. That's what the impeachment evidence used solely for the purpose of impeachment is. You have to be gone by Friday. They left on Tuesday. There's no evidence that they had work that was authorized in writing beyond Friday. That is the key point. Was there any questioning of witnesses about that? Was there a cross-examination of their witnesses? Pointing out what you're pointing to me now. I was wondering if there's an explanation from Gulf as to why there is no written record of projects. There is not a single attempt by Gulf's witnesses to put on any evidence of written agreements for work. In other words, when we get to the damages, because this was bifurcated and there was a damages phase, Gulf's CEO, Gulf's CFO, Mr. Nick Massimini, testified, I'm not aware of any work that was incomplete that was authorized that we couldn't finish. Mr. Mackey, the on-site supervisor, I'm not aware of any work that we couldn't finish because of what Dow did. The expert that valued the damages, they didn't value it based on work that was authorized. They simply valued it based on 90 days' worth of lost profits. So this is a scenario where everyone agrees that there is no obligation under this contract to provide services at any point in time, but it's Gulf's provision that somehow the 3.1 without cause termination provision creates an obligation during that 90 days. And that simply is not the case. And just for the law with regards to why we say that the district court erred in ruling and denying summary judgment, when the words are clear and explicit under the civil code of Louisiana, you can't look beyond the contract for the intent of the parties. And you can only look to extrinsic evidence when there already is an ambiguity to clarify it. If you look at what the district court decided, she looked at the question or testimony regarding, and this is in the summary judgment stage, regarding how work was assigned. And she took that and either at best she completely negated 6.1 that says it has to be in writing, and at worst she used that to create an ambiguity with regards to the termination provision because she ultimately found in the summary judgment that there was no requirement to utilize their services unless there was previously authorized work. And the contract specifically tells you how previously authorized work is to be handed out. And the testimony at trial, the testimony of both Mr. Mackey and Mr. Chad Nockham, go through chapter and verse, and if you look at the, see if I can give you some sites with regards to how the work was handed out. If you look at the record, it's 11,798, 17 through 19, 11,796 through 11,798. Mr. Mackey, who's the on-site manager for golf, and Mr. Nockham, who is the maintenance supervisor for Dow, they testify how work was handed out. And as a fact, it was handed out the week before for the Monday at most through Thursday. So at most you're talking about work that was assigned from Monday through Thursday for one week and golf leaves on Tuesday. On their own volition, they terminate everyone. Explain how that $55,000 estimate was offered by your client. And so with regards to the testimony with regards to our expert, he was asked, the same questions that were asked of the plaintiff's expert, what's the value of the work previously authorized? Zero. There is none. She said the same thing. She has no idea. Ms. Avery had no idea what the value of work previously authorized was because that was not how she was basing her calculation. So they based it on a daily average of profit from the past year and multiplied that by 90. And so our expert, for an alternative in the event that the jury did not believe us, offered a similar analysis based on what he determined was the daily average of profit. And if you see what the jury did, as indicated in our brief, they took the 220, they took the 50, and they divided it by two to come up with the 138, which comes out to two and a half times the daily profit for the three days remaining on the work, if you give them that. And there's testimony in, I think I'm running out of my time, I'll save for rebuttal. Is this the three minutes left for? We have three minutes left. And then five more for rebuttal. Great, great. And so there's no reliance on the law or the contract, which is the law of the parties, by the appellee. Instead, it's talking about all the extraneous testimony regarding how things may have occurred. With regards to the question of whether there was previously authorized work, Dow's expectation on how they hope this had worked out is not previously authorized work. Under appellee's argument, because Dow enters into a four-year contract on an as-needed basis for a service agreement, and Dow expects them to perform work over those four years, then Goff would be entitled to four years of lost profits. In fact, they argue that, and that was dismissed before we got to the trial court, but that's the theory. There is no reasonable interpretation of this contract, which requires Dow to pay for services which were not authorized and were not performed. There's no requirement, once we decide to end our relationship, for us to actually start providing them work. There is an expectation that there's going to be a smooth transition, but that is absolutely not us authorizing them to perform work, such that we have to pay them for the work that they didn't perform. At the end of the day, we would ask your honors to either reverse and render on the summary judgment, which dealt with the breach of contract claim, which was the sole claim that ended up going to the jury, or the denial of the Rule 50 motions, both based on the breach of contract and the damages, and they're all very similar. In your jurisdictional statement, you make some assertions about the place of incorporation and principal place of business, but there's no record evidence for any of these assertions as far as I know. We need to make sure we have jurisdiction for the diversity jurisdiction. Is there evidence in the record establishing federal diversity jurisdiction in this case? I believe so, your honor, and let me just look real quick so I can determine. I mean, I believe the original removal establishes the jurisdiction. We can look there, and there's supportive materials that would satisfy that. Yes, your honor. Thank you. Thank you, your honor. We just have time for rebuttal. Good morning. Since we're there, in the briefing notice that the court issued to both parties on June 4th, we specifically asked the parties to address whether there's complete diversity among the parties in the appeal, and I don't see anywhere in your brief or materials that you ever did that on behalf of your client. Am I wrong? I'll be honest, your honor. We alleged, and I don't think there's been any dispute, that our client is a Louisiana company. Dow is a Wilmington, Delaware company. It's a case in excess of $75,000. So you believe there's proper diversity jurisdiction here? That's correct, your honor. In LSC, it's based on who owns it, not where the company's located. So who owns Gulf? Vint Massimini and Nick Massimini. They're residents of Jefferson St. Tammany Parish. Well, next time we ask for something specifically, we expect you all to comply. Thank you. You may continue with your argument. Thank you, your honor. Dow's appeal centers around invalidating the 90-day clause, Section 3.1A of their agreement for services, and they do this a couple of different ways. They try to do it a couple of different ways to say that 90 days doesn't mean 90 days. First thing they have done is they bring in Sections 1.1 and 1.6 to say that during the 90-day clause, the termination clause, which is a without cause termination provision, that those effectively mean 90 days can mean however long Dow wants it to mean or however short Dow wants it to mean. That doesn't work for a couple of reasons. Number one, the 90-day provision is after a contractor has already become nested out at Dow, and there's a lot of testimony about what that is. Their employees show up every day. They develop certain expertise at that plant and that facility doing the nondestructive testing that Dow needs to have done. So there are some good reasons for a 90-day termination provision, because not only does Dow need to ensure that they have somebody who's at the end of a contractual period for whatever reason, they have to have somebody who's going to be there for 90 days. And similarly, the contractor who's invested the time and the effort and the expertise needs to have some certainty that something's going to continue for that 90 days after termination provision. So 1.1 and 1.6, if they mean that 3.1A actually 90 days doesn't mean 90 days, then you run into a problem with the law of contractual interpretation in Louisiana and in most other states where all of a sudden it's rendered meaningless. And under the law of contractual interpretation, you have to read all the language in a contract to have some meaning. It's not supposed to just be surplus verbiage. And Dow's reading of that would exactly do that. The other way they try to attack 3.1 is they go in this litany of protocol where they issue work orders on a semi-daily or semi-weekly basis. And what they're trying to say is that the only thing that Gulf could have sued for or would have been out are those very few days of work orders that they issue every few days. That doesn't work for a couple of reasons. Number one, all the testimony by the Dow administrators, and if you look through the transcripts, in our case in chief we called seven witnesses. Five of them were Dow administrators in our case in chief on direct examination. Every one of them said that they anticipated that Gulf would be working through the 90-day period. In addition, I think it was Mr. Barbier himself said that the 90-day termination without cause provision operated the same for both parties. That is, Dow could obligate a contractor to remain working for those 90 days if Dow needed them despite termination. And he admitted that it seems to work both ways. So to say that the 90-day clause doesn't mean anything simply because work orders are issued semi-periodically or semi-weekly rather, again, that would completely invalidate 3.1a. And under the law of contract interpretation, that's not allowed to happen. So what they've effectively done, and this is what the judge in the district court had picked up on when she rendered the 90-day clause ambiguous, is Dow's own arguments have effectively called into question what does 3.1a mean? If Dow itself says that 1.1 and 1.6 mean 90 days no longer means 90 days, then that clause is ambiguous. And once it's ambiguous, then it goes to the jury to decide what exactly does it mean. And at trial, every one of the Dow administrators stated that they anticipated that Gulf would continue to work through the 90-day period at least to some extent. There was nobody who denied that. Now, Dow also has gone to great lengths. They submitted some extra testimony for a damaged amount too. Both parties did, Your Honor. That's correct. So their argument that seems to be, wow, you're finding us liable for money that doesn't exist is inconsistent with the fact that they had an expert, and the jury seems to have come in between the two experts. That's correct, Your Honor. Our expert took the last several years of profits for a similar 90-day period and extrapolated that to figure out what the loss would have been in this case for that 90-day period of time. Obviously, theirs calculated possibly two or three days worth of work, and the jury came in in the middle. I don't know exactly how the baby was split by the jury. I know Dow has proposed at least one formula. I don't have any inside information on how the jury came to that conclusion. But obviously, the jury in the ruling from the 50B, the district judge allowed, that the jury had found that there was some obligation during that 90-day period that was beyond just the two or three days that Dow claims is the only thing that would be due. So I think the jury felt that 3.1A meant probably something pretty close to 90 days if it says 90 days, and if that was ambiguous, the jury filled in the meaning for that. Dow also tries to get some traction out of calling this a master service agreement, MSA, and I don't really think it makes a difference what you call it. What does the language mean is the operative issue here, and they cite a few cases, Stute and Huffmaster and Gulf South Scaffolding, all of which don't involve whether or not a termination period has been violated. One does involve a 24-hour termination period, but the issue wasn't whether that was shortened. It was whether they could do it, and the contract said they could do it, so they could do it. So those don't really apply. So whether you call this an MSA or not, the court initially dealt with that after the 12B, and the court said that that's really not what's going on here. We have to see what this language means. After the summary judgment, the court found similarly. The jury found similarly. 50B, after trial, once again the judge said that the jury obviously believed the testimony, not just of my, of Gulf's folks, but of Dow's folks, that something had to happen during that 90-day period. As far as, I guess I'll address whether the 90-day clause was then breached, because there was a lot of effort expended to say that the impeachment of Mr. Mackey is the long and short of whether something was breached, and that's all there is. That's absolutely not the case, and I'll get to Mr. Mackey and whether or not that was a proper impeachment in a moment. But in her ruling on the 50B motion after trial, the judge very specifically said and cited to testimony revolving around a series of internal Dow emails that started around July 24th and went to right about the week before in September when Dow ordered Gulf to leave the plant. As of July 24th that summer, Troy Barbier, the sourcing manager for Dow, said that I'm concerned about kicking out Gulf for cause because they're living up to what they have to do under the contract. Within a month and a half, there's a string of emails with Allison Kuhn, who testified, and other folks all saying that we need to get Gulf out, I can't wait to get him out, I need him out last month, all caps, all that sort of stuff. It's time to pull the plug on them. It's urgent. I think that other contractors will be able to get the employees that Gulf would once word gets out about this. Under whatever circumstances, that was enough for the jury to say Dow was plotting to breach the 90-day period. And in fact, on September 15th, Troy Barbier sent a letter to Gulf that said we're invoking 3.1 90-day provision, you have until December of this year, roughly 90 days, and the contract's terminated. The next day, Gulf was kicked out of the plant. They were told actually to be out by Friday, and they vacated within that time. The emails are cited by the trial judge as the basis for the jury's determination that Dow had plotted to breach this contract. It's not the substance of Mr. Mackey's prior inconsistent statement that was what the jury based the breach on. It was the fact that Dow's own internal email showed that they were trying to get Gulf out as fast as possible. In fact, there was one right in the beginning of September that said that we're looking to do this by September 15th. And that's exactly what happened. So despite the fact that there's a 90-day provision that is, and actually I guess just to make sure the Court's aware, there are six other termination provisions that allow for either immediate or one-day notice terminations. Once again, if 90 days and 3.18 does not mean 90 days, it's meaningless, it's completely surplus verbiage, and the rest of those provisions don't make any difference either. And that's not something that can happen under contract interpretation. Now to get to Mr. Mackey, Mr. Mackey was asked... Let me ask you before you leave that, in your understanding, what does 1.1 mean then? You're saying that you have to apply 3.1 to say that for 90 days we'll keep getting work. 1.1 says you only get work when we're ready to give it to you. So isn't that more or less surplusage under your theory? I don't believe so. I think there's a couple of things working here. And the exact interpretation of 1.1 obviously wasn't part of what the trial was about. But nonetheless, under the regular functioning of the contract, obviously DOW is going to issue authorized work permits or work orders to whatever contractors they have. But that's not the sole question. The sole question is whether during the 90-day period is there a different right or obligation that's created. And that's why that's ambiguous, because DOW is saying no. But there obviously is. Where does it ever say that you're entitled to 90 days of work during the 90-day period? I don't read the contract as saying we... You're not on a constant contract. You're paid on the work that's done, correct? Gulf was paid on individual work. They don't have $100,000 per month they're paid no matter what they do. They're paid. Is that what the evidence shows? It's not exactly that. It doesn't exactly operate that way, Your Honor. Gulf... You had to come up with all these theories about lost profits. It seems to me that there's no obligation of a certain amount of money, and so you had to go back to the history of what money was being made. That's correct. So under 1.1, when it says as requested by DOW, I mean, I don't know if you got into this, whether there was always work every week that DOW was providing to Gulf, but it does seem to me 1.1 has to have some meaning. It does have some meaning. And your interpretation of the 90-day provision really says there's no discretion on the part of DOW. We might be talking past each other, Your Honor, and let me see if I can clarify what my point is. 1.1 specifies how work is doled out. DOW has got to authorize it. Every one of the DOW administrators said that they anticipated that DOW would continue to authorize work to Gulf during the 90-day period. That doesn't validate 1.1. Anticipate may not be the same thing as being legally obligated to, which is what this case is about, I think. Well, whether the 90-day provision created a different obligation than the normal run of the contract is a question in this. The court ruled the 90-day provision to be ambiguous, and the jury, after listening to the testimony, thought that there was an obligation that DOW had during that 90-day period beyond just whenever they wanted to call it quits. To give you some context as to why that makes some sense in a bigger picture, just in the industry, like I kind of started to mention earlier, when DOW gets a nested contractor, the nested contractor's personnel and equipment are located on DOW's facility. That's where they show up. They don't go to my client's headquarters in the neighboring parish here in Jefferson Parish. They go to DOW's facility. They show up every day. The minute they hit the gate, they're on the clock. They're getting paid for something. DOW needs two nested contractors to complete the NDE testing to keep their facilities operating. There was a lot of testimony about how difficult it is to keep things staffed and how the other contractor they had at the time, Turner, was having trouble, and my contractor wasn't, Gulf. There was a lot of testimony about the fact that this is a necessary situation for them to operate, and if Gulf would just evaporate one day, that would be up the creek. They need that work done. So to give both parties some security during a termination period, the 90-day clause makes sense. It makes sense to give both parties some way to transition. In fact, I think to a man, almost every one or if not every one of the DOW administrators said that the 90-day provision was to allow for an orderly transition. Mr. Watkins, who was their contract operations leader, said you can't switch on a contractor like a light switch. You need continued activity with the contractor, and so the contract terminates at the end of that 90-day period. Ms. Kuhn agreed with that. Mr. Normington, who was DOW's contract administrator, said, again, it was to allow for an orderly transition. In fact, once Gulf was kicked out, the only way DOW was able to continue the NDE testing that they needed to do was to have a new contractor's management come in and hire all of Gulf's people on site. So in fact, what DOW effectively did is kick out Gulf's management and kept their folks because they couldn't have completed the NDE testing without Gulf there, or at least their warm bodies, to complete that work. The point being that 90-day provision makes sense to give both sides an orderly transition, and it does create some rights that are different that happens during the regular run. I mean, if you go out there and you put the manpower out there and you develop the expertise, you have containers of equipment out there, it makes sense to not have somebody be able to snap their fingers except in the six provisions that apply, if you lose your insurance, if you commit fraud, if you declare bankruptcy, all that sort of thing. In those instances, you can terminate immediately. But if you're just doing your work and you're out there and you're doing what you're supposed to be doing, both sides need some confirmation that there's not going to be somebody trying to switch the light switch that really doesn't work for either side. So the fact that extra rights are created for that 90-day period makes a lot of sense. And in fact, I think that's what the court understood when the court originally said it's ambiguous. And point of fact, when that originally happened, I believe it was after the summary judgment. I don't think it was after the 12B. I think it was after the summary judgment. The court understood that the 90-day clause itself was the crux of the matter. It's not the rest of the contract language, but that 90-day provision. What does that do different than the rest of the contract? And that's what this case is all about. What Dow has to do in order to overturn the jury's determination is to say it's meaningless. Under contract law, for whatever reason you try to say it's meaningless, that doesn't work. And so that's what they're trying to do. I guess to get to Mr. Mackey, Mr. Mackey was asked specifically, did you tell anybody at Gulf that Dow was shortening the period, having you all leave before the 90-day period? Mr. Mackey denied that. Mr. Massimini, who's one of the two owners of Gulf, testified about a prior inconsistent statement that Mr. Mackey had, where Mr. Mackey had told Mr. Massimini that Dow, specifically Allison Kuhn, had ordered Gulf off the plant prior to the 90-day period. The judge allowed that after discussions and argument among counsel. The judge allowed that because very specifically under 613, Mr. Mackey said something that was a prior inconsistent statement. Testimony was allowed to refute that. Mr. Mackey's credibility was very important in this trial because one of the things that Mr. Mackey did testify is that he tried to say that Gulf left on their own, which for all kinds of reasons, and you can read in the testimony, Mr. Massimini testified would have been tantamount to insanity for Gulf to slit their own throat like that. There was absolutely no reason Gulf would have done that. So Mr. Mackey's credibility was very much at issue. So we brought in the prior inconsistent statement to impeach Mr. Mackey's testimony. Now, Dow doesn't like the underlying information that was the substance of that prior inconsistent statement, and the judge did render a protective ruling or a protective charge to the jury that the underlying substance of the prior inconsistent statement is not to be considered, but the fact that there was a prior inconsistent statement testified to can affect his credibility. Obviously, Dow didn't like that, but again, Dow tries to say that that's the only reason that the jury could have found that Dow breached the contract. That's not the case, and again, the judge was very specific in ruling on the 50B motion that the testimony and the string of emails showing Dow plotting to kick Gulf out early is really the basis for the jury's determination. So although it was important to impeach Mr. Mackey's credibility for various reasons, that in and of itself isn't a lone substance of the breach that was found here. I think that's all I have. Thank you. Thank you, counsel. We'd be happy to recognize you. Thank you. Briefly, one thing you did not hear in argument was that there was previously authorized work that couldn't be completed, completely ignoring Section 6.1 of the contract, which requires all services to be authorized in writing before they were performed, and I think that's significant because that is what the contract and the law between the parties required. With regards to our interpretation and Gulf's interpretation and the argument that our interpretation renders the 90-day provision meaningless, under Louisiana law, under Article 2050, when you're interpreting different provisions of the contract, you must interpret them in a way that's consistent with the contract as a whole. As Your Honor asked, how is Gulf's interpretation that you're required, after you provide notice of termination, to give them work for 90 days? It is not consistent with 1.1. It's absolutely contrary to 1.1, which says you're only to provide work when I ask you to, and it has to be in writing. So Gulf's interpretation renders 1.1 meaningless. The contrary, our interpretation renders the entire contract meaningful. 1.1 requires it's only as needed. 6.1, when our job packages are given to them, it's authorized in writing. 3.1a, we can terminate the contract. It terminates the relationship,  after we give them a notice, day 2, day 3, day 4, and ultimately, if you go beyond the testimony that was offered solely for impeachment purposes, and you say, Ms. Coons ordered Gulf off the premises by Friday. Notice on Monday, you've got to be going on Friday. On Tuesday, they quit. At most, the work that could have been performed or could have been authorized would have been Wednesday, Thursday. That's it. They were paid for Monday and paid for Tuesday. And the question with Gulf, as soon as they step on the premises, they're paid by Gulf. They're not paid. Gulf is not reimbursed unless they perform services for Dow. And I want to correct one misstatement that I absolutely made. The question took me off guard with regards to the diversity jurisdiction. It was not removed. It was in the original answer filed, and I apologize for that, but if you look at the record, Doc, in our answer, we admit status as a Delaware Corporation principal place of business in Michigan, so I apologize for that misstatement. A couple of things I want to correct. Mr. Barbier's purported testimony that he agreed the contract obligates Dow to provide them work couldn't be a larger misrepresentation of the record. If you look back at the ruling by the district court on the Rule 50 motion, the district court admonishes counsel for suggesting that's what was said, and I would point your attention to the record at 11,882 lines 15 through 18, and he testifies that it's his understanding that if Dow gives them work, Gulf's required to complete the work, but Dow is not required to give them the work. That's specifically what was in the record, which is the exact opposite of what was in the brief and what was argued today. With regards to... With respect to counsel on the other side, I'm pretty sure what he said today was that these witnesses said they anticipated as opposed to they're obligated, and I asked him about obligated as well, so I didn't quite hear it that way. Do these witnesses at least say that they expected that Gulf would keep working? Your Honor, and yes, and I may have misheard him because it's in the briefing for the appellee brief, which is why I focused on what he said with regards to Mr. Barbier. The witnesses, as I said, in the original argument, they all said we anticipated there to be some sort of relationship, some sort of transition, but anticipation does not require us to give them work. When we signed the four-year contract, we anticipated. That didn't require us to give them four years of work. There was an anticipated sort of wind-down period, but it did not happen as anticipated, but it is not a requirement that we gave them work, and it is not proof that we did give them work. And with regards to Your Honor's question about our experts' testimony seeming to be inconsistent with what we're arguing, Mr. Ralph Stevens was our expert, and on page 12-6-4-7 of the transcript, he testifies that there's no evidence of written work, no evidence of damage from the alleged breach. So we had already lost phase one, which they found that there was a breach, which we were surprised by, so we gave them an alternative, but there was no acknowledgment that there was, in fact, damages. Thank you, Your Honors.